Mr. Lee, you may proceed. Thank you, Your Honor. In this case, the jury found that the plaintiff was 40% contributorily negligent in an automobile accident case involving a vehicle that was backing out of a parking saw in a golf course parking lot into my client's car as my client was proceeding out of the parking lot. There's no evidence to support any finding of negligent conduct on the part of the plaintiff in this case. There are essentially three witnesses to this incident. There was the plaintiff, her son, who was a passenger in the front passenger seat, and the defendant in this case. The plaintiff testified that she was driving in the driving lane of the parking lot, traveling at a rate of 5 to 10 miles an hour at a point at which she saw that the defendant's vehicle was about to hit her. And what she did was she braced herself, she clenched the steering wheel, and then she applied the brakes to the vehicle. Did your client say that she saw the reverse lights on the defendant's car? No, she did not. She did not. Actually, neither she said that she saw the reverse lights, nor did her son. He indicated he did not see the reverse lights on the vehicle. My review of the record shows that she said that she saw the backup lights but did not see the brake lights. Okay. That's my review. I missed that in the record. I'm sure you did. If that is the record, we'll recheck the record, but if that is the record, doesn't that signal to a person who's coming through that that person backing up may not stop? I think it all depends upon at what point she did see those lights. Which brings us to one of the issues that you raised is the admissibility of the photographs. Yes. Aren't the photographs, don't they aid the jury in deciding which view, which version is credible? Well, I think if we're talking about contributory negligence, I think that sort of evidence would have to indicate to the jury or give some basis for the jury to conclude that, number one, that my client saw this vehicle coming out, and, number two, that there was time for her to react. And I don't see where that evidence alone would be able to answer those two questions. I think at the very least you would need expert testimony to indicate that. Didn't the son say that the door was damaged and the photographs showed damage to the door? The photographs did not show damage to the doors. No, no, no. They did not. The son did say that there was damage to the door. The son did, and the plaintiff said that there was damage to the wheel well to the right, to the front tire on the passenger side. Yeah. And the crease in the door. Did the plaintiff indicate that she didn't see the brake lights, meaning that she didn't see them at all and, therefore, she didn't know whether they were lit or they were unlit? Or did she mean that she saw the brake lights and they weren't lit? Because if she can see the backup lights, usually the backup lights, using my common sense and everyday experiences in life, are fairly close proximity to the brake lights. That's correct. And, therefore, if she saw the backup lights, she probably could have seen the brake lights in her field of vision and determined whether or not they were either lit or unlit. If they were unlit, wouldn't that tell her that the car was actually backing up without braking and that a collision was imminent? Well, again, it's a question of at what point was she able to see that. If she was able to see that as she testified at a moment when the collision was instantaneous, then I think there's a question of did she have time in order to do anything to respond to seeing the lights. Seeing the backup lights, if, in fact, she saw the backup lights, that still doesn't answer the second part of the equation. And the second part of the equation is that was there time for her to react? I think you mean the second part or the third part of the syllogism? Possibly. In your briefs, you cite Genesco. Genesco was different, correct? Yes. That involved a vehicle pulling out of a lot into a four-lane highway. That's correct. It's a little different, isn't it? Well, the only reason I cited that is because the argument that was made in that case was that the conduct of the defendant in that case somehow should be indicative of the negligence on the part of the plaintiff. But the issue is in that case that Genesco was the assignment of liability, not comparative fault, correct? That's correct. That clearly was not a major case that I cited in my brief. I mean, Branny, of course, was the major case that I cited in my brief with respect to the photographs. And then I also cited the Peach case, which is a Supreme Court case. Let's talk about Peach. In Peach, there was an argument based upon the damage depicted in the photographs that the plaintiff was exaggerating the injuries, correct? The impact. There was no such argument in this case? Well, no, no. There was none, correct? You're correct. There was no such argument in the case. But the point that I'm trying to make on that particular issue is there was no issue of consequence in this case that could be aided by the introduction of the photographs. The fact that there was a difference in the testimony with respect to where the contact took place, plus the difference in testimony as to the force of the impact, that really wasn't the issue. The main issue in this case was did the defendant hit the plaintiff. And clearly the evidence is that the defendant hit the plaintiff with his car. So your argument is under those facts, the jury could not properly attribute any fault to the plaintiff? Yes. And that this is a rock-solid case for 100% negligence on the defendant and non-attributable to your client? Well, I'm saying there's no evidence, absolutely no evidence. What if the jury thought that 5 or 10 miles an hour in a crowded parking lot is excessive? 5 or 10 miles an hour is not slow. It's a pretty good clip. If you imagine a runner or a bicycle through a crowded parking lot in a golf course, that's a pretty good clip. Well, pulling a vehicle out of a parking stall at 5 miles an hour also is a pretty good clip. Backing out of a spot in a parking lot, you don't have vision side-to-side until you actually are out into the pavement area, would you agree? Absolutely. And that's where the collision occurred. The collision occurred, right. It was the right front wheel well on the passenger side made contact with the right rear bumper area of the defendant's car, correct? That's correct. That was the point of contact, yes, absolutely. And your argument is that that version is completely consistent with the defendant being 100% at fault? That version together with all of the available testimony in this case, yes, that is my argument. So essentially I think what the jury did here was it speculated in terms of when it thought the plaintiff saw the defendant pulling back in his vehicle out of this parking stall and what she could have done. I think there's absolute speculation. If not speculation with respect to when it became visible, speculation certainly with respect to what she could have done in the time in which she had to react to this vehicle pulling out. Why was golf not relevant? The plaintiff's golfing. For several reasons, but essentially there's absolutely no testimony, no evidence in the record to indicate that the golf in any way adversely affected the plaintiff's health in this case. We have three medical witnesses in this case. The plaintiff had two treaters who testified that the injuries that were sustained in this case or that were suffered by my client were connected to the accident. In the sense of exaggerating the injury or symptoms returning or in the sense that the torn rotator cuff, which was torn in 2009, repaired itself and then got retorned? It didn't repair itself. She had a frozen shoulder in 2009. And a partial tear. And she had a partial tear, but it didn't... And she had a partial tear in 2014. The distinction I'm trying to draw is that she had the same tear in 2013. She had a tear in 2013. She had a tear in 2009. There's absolutely no evidence in this case that the condition she had in 2009 was related to the injuries which she suffered after the accident in 2013. Even the defendant's expert testified to that effect. And getting back to the experts in this case, we've got two treaters who are well-experienced in treating athletes testifying. The surgeon testified that the plaintiff was not... It was not ill-advised for her to be playing golf after receiving treatment from Dr. Bennett, who was the primary care physician. Dr. Bennett testified that a person can play pain-free golf even with a rotator cuff injury. He also testified that continuing to play golf most likely was not going to further injure this person. And he also testified that, in his opinion, playing golf did not adversely affect her recovery or her treatment in the future. The defendant, the defense expert in this case also testified that it was his opinion that the golf did not cause or contribute to either the surgery that my client had or the pain that she suffered from this accident. So we've got three medical opinions essentially saying that golf was unrelated to the injuries that were being... that were experienced by my client. In addition, there is absolutely no other evidence in this case that in the many years that my client played golf, which I think totaled about 40 years, she had ever suffered any injury to her right shoulder. So we've got a complete absence of this. And I think the real reason that golf was thrust into this case, and it was thrust into this case quite extensively through cross-examination of the plaintiff, through argument during trial, and then through argument during closing argument, I think the reason came out during redirect examination of Dr. Player. When the defense counsel asked Dr. Player, you've been asked, haven't you, whether golf is the sole cause of the plaintiff's injuries? And Dr. Player answered, correct. Now, I know that the trial judge, after argument on the matter, did go back on the record and instructed the jury to disregard that comment. But I think the importance of mentioning that is that it reveals the purpose for all of this argument and all of this testimony regarding golf. Golf, on the basis of all of the evidence in this case, had absolutely nothing to do with my client's injuries in this case. So I think that... Well, the fact that your client, she played golf, what was it, four times between the date and the date that she saw? Yes, she did. And your argument is that the trial court abused its discretion in allowing testimony about that. My argument is on the basis of an absence of any medical evidence or any other evidence in the case, that there was any relationship between her playing golf, whether before the accident or after the accident, it was an abuse of discretion to allow that sort of testimony. That's the sort of argument. With regard to Dr. Player's opinions, your contention is that the trial court improperly admitted his testimony for lack of foundation, correct? Just with respect to that one portion of his testimony, the testimony... But the rest of it you accept? I think that in this case there was clearly conflicting evidence with regards to damages. I think Dr. Player stated his position and backed it up with the reasons why he believed that the plaintiff merely suffered a periscopular muscle strain. And I think that the two treaters that the plaintiff presented, presented opinions and backed it up as to why they believed that her injuries and the surgery were connected to the accident. What about your client's admission she did not complain of injury? She did not seek medical attention immediately? Right. She waited... Was the jury entitled to weigh and evaluate that in light of the expert testimony? Well, certainly they could, but I think what's important to note with respect to that is that even the defense expert was willing to testify that she sustained an injury from that accident. So the fact that she didn't report it immediately, she waited four or five days, six days, whatever it was, that's not a significant amount of time. And she did testify that she suffered pain in her shoulder, and she did testify that she thought she was treated with gangue or some pain medication that evening. And we're not dealing with a fragile individual here. We're dealing with somebody who's been a police officer for virtually all of her life, and she's a very active individual. And even though she had pain in her shoulder, she golfed anyway? She did not have pain in her shoulder when she played golf. That's the difference. And Dr. Bennett said... Does the pain disappear when you play golf? It's a different movement, Your Honor. It's an absolutely different movement. So the pain only existed when she raised her arm in a certain manner? Well, when she raised her arm and apparently when she had to scratch her back and scrub her back and things like that. Well, the AC, the doctor testified the AC joint is at the top of the shoulder, correct? So the golf swing does not involve that particular area? According to Dr. Bennett and Dr. Newberg, who are well-experienced in dealing with athletes of all kinds and of all types, yes, that is it. You saw pain and suffering, did you not? Yes, we did, Your Honor. Well, do you consider playing golf suffering? Not in the sense that you're suggesting, Your Honor. Okay. And so it isn't at least whether or not she plays golf with or without pain relevant to whether or not she is suffering, at least to the nature and extent of her avocations, her hobbies, her enjoyment of life? I would agree with that. I would certainly agree. So it would seem that it would be admissible at least to establish that this injury didn't adversely affect her ability to play golf. So what exactly are you objecting to having this evidence relating to golf being admitted for the jury's consideration? But I don't think the argument ever was that the pain and suffering that she experienced was encountered when she played golf. I think all of her testimony was that the pain and suffering had to do with engaging in day-to-day activities in which her arm movement... Doing various chores. Yes, exactly. Well, was there any expert opinion that the injury was caused by playing golf? No, there was no expert opinion that the injury was caused by... Then why are you saying that there's some argument that the golf issue or the golf evidence was improperly admitted? If it wasn't a bone of contention that the golf was causing the injury, then what is the error or what is the abuse of discretion to admitting it when it at least has a limited purpose, which you could have had an instruction to the jury on? I think... Maybe I should try and rephrase it. No. You've indicated that there was no argument relating to the idea or the proposition that the playing of golf was the cause of the injuries. And if it wasn't that, and it could be relevant to whether or not she was experiencing pain and suffering in the things that she enjoyed doing in life, then what was it admitted for? Well, again, I return to that question that was asked of Dr. Clair, which placed the issue of the causation between the golf and the injuries in front of the jury. That was a clear indication to the jury that, hey, this is the reason we're presenting all of this evidence on golf. Hey, this is the reason we're making arguments regarding golf. It's because we want to tell the jury that the golf was the sole cause. I thought you just told me that that wasn't in contention. That's absolutely correct. That wasn't in contention, and that's one reason why this evidence, why this testimony, and why these arguments should not have been made in the case. What is not in contention is the fact that in 2009 an MRI showed that your client had a partial thickness tear to the rotator cuff, correct? Correct. And some arthritis in 2009. Correct. And pain in 2009 from the arthritis, correct? Correct. And what is also not at issue is that the MRI in 2013 still showed only a partial tear of the rotator cuff and arthritis. That's correct. And between 2009 and 2013, there was absolutely no pain experience. And the jury could, your argument is that the jury in awarding $10,000 was what? The argument is that the jury in awarding $10,000 was provided with a lot of evidence in this case that it should not have been provided with, which could have influenced this decision and its award of damages, particularly in light of a case where you've got conflicting evidence on damages. When the question is close and the jury could go either way, I think any error of any significance in the case is a reversible error. So that would be my argument. Okay. Your time is up. You'll have an opportunity to make rebuttal. Thank you. Thank you, ma'am. Mr. Ryan. Thank you. You may proceed. May it please the Court. I represent Charles Subel, the appellee in this manner. We request the Court to inform the jury's verdict at the trial court level for the following reasons. One, the jury's finding of contributory negligence was not beyond the manifest way of the evidence. What plaintiff has not brought out is that in their case in chief, another photo was introduced. By the plaintiffs themselves, it was a photograph of the parking lot. And Mr. Bonta and Mr. Subel testified as to the size of the accident, as to the location of the vehicles that were involved in the accident immediately before and after the collision. With regard to that photograph, the jury was able to ascertain the width of the lanes that Ms. McLaughlin was traveling, as well as the distance that Mr. Subel had to travel to make contact with that vehicle. Now, what's important here is that the photographs that are in detention go to the contact of the vehicle. That is, it shows that the contact was made with the right rear bumper of Mr. Subel's vehicle and the right front wheel well of McLaughlin's vehicle. The reason those photographs are important is that it demonstrates where the actual contact points were. There are three versions of where the vehicles made contact. Anywhere from, if you would believe Mr. Bonta, at the door, if you believe Mr. Subel, at the front wheel well, and if you believe Ms. McLaughlin, somewhere in between. The reason this is important is because it armed the jury with the necessary facts, coupled with the picture of the parking lot, that Ms. McLaughlin had ample time to either stop, sound her alarm, or take evasive action. With regard to... Was there, did the photograph show that there was room to take evasive action? If, as I believe the record shows, she said she saw the backup lights, did the photograph show that there was ample room to take evasive action? I believe it does, Your Honor. The photograph showed that there was a main lane of traffic that was of dark color. On either side of that, of equal distance, were adjacent lanes in lighter gray. That was pointed out to the jury in my closing argument, where I made a distinction between the two colors. If you believe Ms. McLaughlin... Oh, it's right there. The contact points are important because if Ms. McLaugh... If the contact was made at the door or behind, then obviously Ms. McLaughlin would not have time to react. In this case, she had ample time to react. Her own testimony was that she saw the backup lights coming. It's a parking lot. It's not a preferential roadway. The rules of the road don't apply in this parking lot. As such, there was enough evidence for the jury to decide that Ms. McLaughlin was contributory negligent. What about golfing? How was golfing relevant in light of the expert testimony? Golfing's relevant because of the frequency that Ms. McLaughlin golfed. She testified that as a result of the impact, she braced herself, she was jostled, she suffered pain in her right wrist, she suffered pain in her shoulder. Within 24 hours, she's golfing. Ms. McLaughlin belonged to a league where she posted her golf dates, her scores, as well as the venue where she golfed. But all the doctors testified that she could still have this injury, this pain, and still play golf. Well, if you're in an accident, the question to present to the jury, if you're in such ill-being, how can you golf three consecutive days before seeing an orthopedic surgeon? She testified that she had her wrist was hurt. How can she physically get out and do that? She said she did. The physicians were referring to her shoulder. Ms. McLaughlin testified that as a result of this collision, one of the activities of daily living that are imperative is her ability to grip the can of a lid in open jars, grip a vacuum cleaner in vacuum. How can you golf 60 or 70 times from the day of this accident to the day of her treatment and suffer those conditions? Not only did we read out the frequency, we brought out her scores. Gentlemen, for me, golfing is, if I find more golf balls than I lose, it's a good day. For her, she was golfing consistently in the 80s and maintained whole golf courses. This did not impact her activities of daily living. Additionally, they were asking for pain, suffering, nature, duration, and extent of her injuries. How does that exist if she's out there consistently golfing almost on a daily basis? Her own testimony was that she would golf both before and or after she attended physical therapy. It was the frequency and her scores that indicated, or the jury could infer, that this collision had no impact on her ability to conduct her daily activities, her activities that she routinely enjoys. Coupled with her testimony that she couldn't grip a jar and she's impaired that way, that's contradictory to the ability to golf. We've come down to the photographs. It was on the abuse of discretion to let the photographs in regarding the contact point of the vehicle. The photographs were not used to show a correlation between the force of the impact and the injury sustained. It was done primarily to substantiate Mr. Zubel's testimony that he made contact with the front wheel well. The comparative fault issue. Comparative fault issue. The judge at the trial level made it very clear not to touch the damage issue, and we never went near that. It was the plaintiff on his cross-examination that brought out the nature and extent and the force of the collision, the reference to the dent in Mr. Zubel's bumper, and that prompted a question from the jury that wasn't objected to, inquiring as to what the substance of the bumper was composed of. What about plaintiff's arguments about Dr. Player's testimony? Well, with Dr. Player's testimony, Dr. Player had a sufficient foundation to give the opinions he gave. He reviewed the medical records, the deposition testimony of the treating physicians, and his opinions initially parroted the first treating physician's diagnosis of scapular dysfunction. Dr. Player basically parroted Dr. Bennett's testimony. With regard to what counsel alludes to as the speculative part of Dr. Player's testimony, that's unfounded. Dr. Neuber, in his testimony, I believe he had the record in 262, when asked could he date when this shoulder condition was created, he said no. It could be caused by a traumatic event, wear and tear, or even age. Again, Dr. Player's testimony parroted what Dr. Neuber said, and he was the surgeon that performed the operation on Ms. McLaughlin's shoulder. What's the significance of the testimony that, in reviewing the records, the plaintiff passed the empty can test in July? I believe the significance of passing the empty can test in July is testimony that there isn't a significant rotator cuff tear. And again, with the rotator cuff tear, both Dr. Bennett and Dr. Player testified it was the same tear that was noted prior to the incident, and the only difference was that the technology had gotten better to give a better definition. Surgical techniques are better now. Yes. Dr. Player did opine that the injury sustained by the plaintiff certainly could have been caused upon her initial examination and physical therapy could have been caused by this accident, correct? Yes. Dr. Player opined that the accident caused the scapular dysfunction, as Dr. Bennett testified. He opined that the physical therapy she received was all that was required for her to go back to her initial state of well-being prior to the accident. So why then is golf relevant in that first period of time? Well, she testified that she had problems with her wrist, and she testified to the nature and extent of ill-being. And then within 24 hours she's golfing. It's contradictory to her statement. You get wet, it's a good wet, you don't get up within 24 hours and go golfing. You don't partake in a physical activity that requires you to move your body. Anyone who's suffered a whiplash injury, those symptoms become apparent anywhere from 12 to 36 hours after the event. She did not have any ill-being that prevented it. There are some golfers that will get up the day after an accident and go play golf. Well, if they do, Your Honor. Even if they're hurting. If they're hurting, I would expect their scores to be impacted. Ms. McLaughlin's scores were not impacted at all from the time she, from that first golf date within 12 hours after the accident to the time up to her surgery. Didn't she testify she took Advil? Yes, Your Honor. And at my age and her age, I'm sure we all take Advil for whatever aches and pains we had. It was a non-prescribed, over-the-counter anti-inflammatory. So the Advil may have relieved the pain and she was able to play golf. Well, if it did, then that would further substantiate the lack of the significance of her injury that could be cured with an over-the-counter medication. You argued early on that the jury's verdict was not against the manifest weight of the evidence. Is that the standard of review here? For that, I believe it is for that first issue. The first issue is whether or not a judgment and ovation have been granted, correct? Right, and the judgment and ovation do not have been granted because, again, I believe it's the manifest weight of the evidence is the standard for that. Well, it's taking the evidence most favorable to the non-moving party and whether a contrary verdict or whether no contrary verdict could stand, I think, is something of that nature. I mean, it seems like it's stronger than against the manifest weight of the evidence. It's the Pedrick standard, correct? Yes, Your Honor. It's a more burdensome standard for the plaintiff than what you described to him or her. I stand corrected, Your Honor. For the following reasons, we believe that the jury verdict should stand, Your Honor. Thank you. Thank you. Mr. Lee. Thank you. With respect to the photos of the parking lot, the photos of the parking lot did not depict the location of the vehicle as it was pulling out of the parking spot. It was not able to provide that sort of information to the jury. As I understand that photograph, and it was not, it's not in the record in this case, it's certainly referenced in the testimony, and the exhibit's receipt that is in the record in this case does not list that particular exhibit, but as I understand it from the testimony, it was kind of an overview of the parking lot, which just basically showed the layout. The layout of the parking stalls, et cetera. Right, but I don't think it contributes to the question of when the plaintiff was able to see the defendant backing his vehicle out of the parking stall and what she could have done in that time. Well, there was no diagram, no reenactment, no computer-assisted exhibits for the jury. No. And certainly no expert to prove their case. And no expert testimony to analyze whether somebody backing a vehicle out at 5 miles an hour or at idle speed. Or 10, which is double. No, backing out. Well, no, I'm talking about 5 or 10. Your plaintiff's testimony is she was going 5 to 10. Right. And what I'm saying is the defendant, though, testified that he was backing out at idle speed and when questioned closer about that, he said perhaps about 5 miles an hour. That's the only thing. There was no expert to say when somebody driving 5 to 10 miles an hour in the driving lane of a parking lot is going to be in a position to see somebody backing out of a parking lot at 5 miles an hour. So that's the only point I wanted to make. In terms of the wrist injury, there was no treatment for any wrist injury here. So I think that's right here. Well, her testimony was that she had a wrist injury. She had a wrist injury certainly at the time of the accident, but there was no testimony that there was any treatment for that wrist injury. Well, she played golf the next day. That was the point. No, I understand that. I do understand that. But what I'm saying is that wrist was not actually in play at that point. So borrow a phrase. Yes, borrow a phrase. I think that's about all I have. Didn't plaintiff's trial counsel, that wasn't you, right? No, it wasn't. Wasn't he the first one to bring up this golfing issue with the plaintiff during her direct examination? Well, actually, there was a motion in limine that was denied by the trial court before trial in which he tried to keep out any testimony, any argument regarding golf. So he brought it up after that ruling by the trial court. Well, the motion in limine can be renewed at any time, including at trial. So by going forward and having the plaintiff testify that she played golf, doesn't that waive the argument that there was an abuse of discretion in denying the motion in limine? But it does not waive the argument that golf was not a cause or did not contribute to the injuries that were sustained by the plaintiff. Certainly, you open the door regarding the testimony that was given regarding her playing golf, but it doesn't open the door to any argument, testimony, or examination of a witness indicating that there's a causal relationship between the golf and the injuries. And who said that there was? That was the question that was asked of Dr. Player during redirect examination in this case. Whether it was the sole cause of the injuries. Whether it was the sole cause, that's correct, Your Honor. Right, I mean, that's different than, I mean, Dr. Player testified that her normal everyday activities developed this symptomatic rotator cuff injury, correct? The surgery, yes, yes. And part of her regular everyday activities pretty much was play golf. But he specifically testified that it was not his opinion that golf caused or contributed to her injuries for a certain, so I think that's incorrect, Your Honor. I have nothing further to say as far as the reverse. Thank you. Thank you. The case will be taken under advisement. Court is adjourned.